UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CWC BUILDERS, INC.,           )
                             )
          Plaintiff,         )
                             )    CIVIL ACTION NO.
     v.                      )    13-11576-DPW
                             )
UNITED SPECIALTY INSURANCE   )
COMPANY,                     )
                             )
          Defendant.         )

MEMORANDUM AND ORDER
September 28, 2015

     This is an insurance dispute between CWC Builders, Inc.,

the general contractor on a residential construction project in

Boston, and United Specialty Insurance Company, the provider of

a commercial general liability policy to Walsh Corporation, one

of CWC's subcontractors on the project.  CWC seeks a defense —

for two lawsuits arising from flood damage to neighboring

property that occurred during the demolition phase of the

project — from United as an additional insured on the policy

held by Walsh.  CWC and United have filed cross-motions for

summary judgment.

## I. BACKGROUND

### A.  *Factual Background*

#### 1.   The Franklin Hill Project and Walsh's Involvement

CWC is a Massachusetts corporation that served as the

general contractor on a construction project known as the Franklin Hill Revitalization Development (the "Project"). The Project involved demolition of existing Boston Housing Authority residential buildings and the construction of new residential buildings on a property in the Dorchester neighborhood of Boston. In April 2008, CWC contracted with Walsh to perform certain work during phase two of the Project.[1]

Under the subcontract between CWC and Walsh, Walsh was to "cut and cap utility services," including drain, sewer, and water services, at nine different locations, and "remove and dispose" of certain soils beneath specific buildings. "Cut and cap" involves the disconnection and discontinuation of the use of the utilities. This work was to "include all dust control and street sweeping for all work by [Walsh]" and to "conform to all requirements of Boston Water and Sewer Commission and the Boston Public Works Dep[artment]."

Although it is somewhat unclear the extent to which CWC and Walsh formalized a plan for Walsh to proceed with its work, Patrick Walsh, on behalf of Walsh Corp., asserts that there was initially a plan for sequential work, and that "CWC had a

---

[1] Although the subcontract and the United insurance policy that the parties have submitted are not signed, they agree that these are the governing documents.

schedule set so that we would start at one building and work our way . . . clockwise around the project."[2]  The plan was for the demolition contractor, NASDI, LLC, to perform some preparatory work at a particular building using the water source from the public main.  Walsh would then cut and cap that building.  As Walsh finished its cut and cap, the demolition contractor would obtain a demolition permit and start demolition on that particular building.  They would repeat the same process with each building, in sequence.

---

[2] CWC submits as evidence in this summary judgment proceeding excerpts from the Rule 30(b)(6) depositions of individuals from Walsh Corp. and the Boston Water and Sewer Commission, as well as depositions of individuals associated with CWC and Boston Water and Sewer.  All of these depositions were taken as part of the underlying *Chubb* and *Cranmore* lawsuits.  United has not moved to strike these depositions or objected to their use.

Fed. R. Civ. P. 32 governs the use of depositions. Generally, "[a] deposition lawfully taken and, if required, filed in any federal- or state-court action may be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action."  Fed. R. Civ. P. 32(a)(8). "[T]he presence of an adversary with the same motive to cross-examine the deponent, coupled with a substantial identity of issues, in the prior action may suffice to permit the usage of a prior deposition in a subsequent action."  *George R. Whitten, Jr., Inc.* v. *State Univ. Constr. Fund*, 359 F. Supp. 1037, 1039 (D. Mass. 1973).  Although United is not a named party in the underlying lawsuits, United is involved in some capacity through its defense of Walsh, and Walsh and United share similar motives.  The issues in the lawsuits also generally involve the same subject matter.  Accordingly, absent a challenge from United, I consider the depositions admissible for the purposes of summary judgment.

The Project began with work on two buildings that required a cut and cap to be performed from the city street, outside the project bounds.  At some point during its work on these two buildings, Walsh learned that "all the copper piping and the water servicing the buildings had been stolen."  As a result, none of the buildings had water to them, which the demolition contractor needed to perform its work.

This lack of a water supply slowed down the schedule and rendered it unnecessary, from Walsh's perspective, for Walsh to go from building to building in order to preserve the water flow to individual buildings during the process.  Walsh accordingly proposed a "global cut and cap so [NASDI, the demolition contractor] could obtain all his permits at once."  On or about May 12, 2008, Walsh informed CWC and NASDI of its plan to perform a global cut and cap.[3]  CWC responded by informing Walsh that "the hydrants must be kept live for hazmat demo."  Walsh moved ahead with the global cut and cap, which involved discontinuing the main lines that were feeding the Project instead of individually cutting and capping each building.  It completed the global cut and cap on or about May 23, 2008.

---

[3] Walsh also sought approval for a global cut and cap from the Boston Water and Sewer Commission.

Although Patrick Walsh contends that Walsh Corp. was not responsible for supplying water to the Project site, he acknowledged that Walsh coordinated with the demolition contractor and CWC to ensure there was an adequate water source. Because water was not available from the water main on the Project site, the demolition contractor pulled water from "the surrounding hydrants outside of the . . . Project" using hoses. At some point, Walsh assisted CWC with connecting the hoses to the hydrants to provide water access.

2.   The Flooding Incident

There is some dispute as to exactly what happened after Walsh completed the global cut and cap at the Project site. Both parties agree, however, that on June 2, 2008, Walsh returned to the Project at CWC's request to attempt to "reliven" the hydrants that were needed by the demolition contractor. That day, Walsh performed an excavation to locate a valve in the main line that was believed to be in the off position, thereby preventing water from flowing normally to the hydrants.  Walsh concluded after locating the valve that the hydrants were not going to receive water regardless of the position of the valve.[4]

_____

[4] Patrick Walsh stated that if water was flowing, it "[e]ventually would have made its way up through the hydrant that was open and spilled out or I would have felt it or heard

Walsh did not charge CWC for this work and instead described it as a "courtesy call."  The parties dispute the precise relationship between Walsh and CWC at the time of Walsh's return to the property.

The next day, on June 3, a flooding incident occurred at a property adjacent to the Project and owned by Avenue Realty Trust ("ART").  The flooding was believed to have been caused by fire hoses on the Project site that were running from public fire hydrants into the basement of one of the Project buildings and were left on after use for dust control at the Project.  The property insurer and the trustee for the ART property initiated separate lawsuits – discussed in greater detail below – against CWC and various subcontractors seeking compensation for the property damage that resulted from the flooding.

    3.   Insurance Policies of Walsh and CWC

Under the subcontract between Walsh and CWC, Walsh was required to purchase and maintain comprehensive general liability insurance in certain amounts,[5] and to name CWC as an

---

it on the hydrant.  When you open it up, you put your ear to it like listening to a seashell and you can . . . hear water traveling."  He reported that none of these indications occurred when he changed the valve position.

[5] Specifically, the subcontract required Walsh to obtain a comprehensive general liability policy for bodily injury and property damage with limits of $5,000,000 per occurrence,

additional insured "on all liability policies . . . throughout the duration of the Project," and for an additional two years after CWC received final payment from the property owner for its completed work.[6]  The subcontract further requires that the insurance policy obtained by Walsh "shall provide that the insurer shall defend any suit against the Contractor," and contains an indemnification clause requiring Walsh to "provide in the policy of comprehensive general liability insurance . . . a contractual indemnity endorsement which insures [Walsh]'s liability under the provisions of [the indemnification paragraph]."

At the time of Walsh's work for CWC, Walsh held a commercial general liability insurance policy (No. GL00043003) from United, effective April 13, 2008 through April 13, 2009 ("United policy"), that is based on the standard Commercial General Liability Coverage form of the Insurance Services Office, an organization that prepares standard form contracts for insurance companies.  *See Am. Home Assur. Co.* v. *AGM Marine*

---

$5,000,000 per project general aggregate, and $5,000,000 products completed operations aggregate, which could be satisfied through a combination of general liability and umbrella liability limits.

[6] CWC also has its own liability insurance provided by Old Republic Insurance Company.

*Contractors, Inc.*, 467 F.3d 810, 811 (1st Cir. 2006).  Walsh provided CWC with a certificate of liability insurance listing the United policy as a general liability policy, identifying additional automobile and umbrella liability policies, and stating that CWC was "Additional Insured on General Liability, Automobile Liability & Umbrella Liability for work performed by Walsh Corp. on the Franklin Hill Phase Two Demo Project."[7]  The certificate also states that CWC is an additional insured "on a Primary & Non-Contributory basis," consistent with the clause in the subcontract requiring that "[a]ny insurance policy obtained . . . to fulfill the insurance requirements . . . shall provide that such insurance shall be deemed primary insurance to any similar insurance [CWC] may obtain for its own benefit, which shall be excess or secondary but not contributing insurance."

**B.   *Procedural History***

  1.   The Underlying Lawsuits

    Two separate actions were brought on behalf of the adjacent ART property, one by the insurer and one by the trustee,

_____

[7] The certificate lists the limits of the United policy as $1,000,000 per occurrence, $1,000,000 personal injury, $1,000,000 products completed operations aggregate, and $2,000,000 general aggregate.  It lists the limits of an additional umbrella liability policy as $5,000,000 per occurrence and $5,000,000 aggregate.  These satisfy the limit requirements articulated in the subcontract.

alleging negligence by CWC and/or its subcontractors in causing the water loss that resulted in damage to the ART property.

The first action was filed on October 23, 2009, by Chubb Custom Insurance Company, the property insurer of the ART property at the time the property sustained the flood damage. *See Chubb Custom Ins. a/s/o Ave. Realty Tr.* v. *CWC*, Mass. Super. Ct. (Suffolk), Civ. Action No. 2009-4536 (Compl. Oct. 23, 2009) (the "*Chubb* lawsuit").  Chubb paid $950,000 to ART for damages sustained as a result of the flooding and seeks recovery of these payments from CWC.  Chubb alleges that the flooding arose out of the use of hoses connected to fire hydrants for dust control during demolition work at the Project, and that the flood damage was the result of CWC's negligence in supervising its subcontractors.

The second action was filed on February 1, 2010, by William Cranmore, the trustee of ART.  *See Cranmore, Trustee* v. *CWC*, Mass. Super. Ct. (Suffolk), Civ. Action No. 2010-0403 (Compl. Feb. 1, 2010).  This complaint was amended on December 8, 2010, and names CWC, Walsh, NASDI and other entities as defendants. Cranmore alleges that these defendants provided demolition services and used fire hydrants in performing these services, and that the work at the Project resulted in flood damage to the

ART property.  The complaint states causes of action for negligence, trespass, nuisance, strict liability, and breach of the duties created by the Massachusetts Tort Claims Act.  The *Chubb* and *Cranmore* lawsuits have since been consolidated.

## 2.   The Tenders and Rejections

CWC tendered defense of the lawsuits to United by way of United's third-party administrator or agent, Aspen Specialty Insurance Company, on three occasions: first on October 8, 2008, then on November 30, 2009, and finally on August 14, 2013. Aspen, on behalf of United, rejected the first two tenders, explaining that it was responsible for paying "only those losses caused through the fault of our insured," and that it believed that Walsh had completed its work for the Project on May 23, 2008, when it performed the global cut and cap, prior to the date of the alleged damage.  Between the rejection of the second tender and CWC's third tender letter, Aspen issued a "Supplemental Disclaimer and Reservation of Rights" to CWC reiterating its bases for denying a defense and indemnity, including its belief that the residential construction work exclusion included in the policy and the fact that Walsh had completed its work for the Project rendered the claims

ineligible for coverage.  The third tender letter was rejected on August 23, 2013.

Despite refusing to provide a defense to CWC, United has provided a defense for Walsh against the underlying claims in the *Cranmore* lawsuit, subject to a reservation of its right to disclaim for non-coverage, based on the residential exclusion in the policy and other asserted reasons.

### 3.   The Instant Proceeding

CWC filed the instant action against United in Massachusetts Superior Court, Suffolk County, on May 21, 2013 seeking a declaratory judgment that it is an additional insured under the United policy and is entitled to a defense and indemnity in the *Chubb* and *Cranmore* lawsuits, and seeking an award of expenses incurred in defending against these lawsuits. CWC also asserts that United breached the insurance contract by refusing to provide coverage to CWC.

United removed the case to federal court on diversity grounds on July 2, 2013 and filed an answer denying that CWC is an additional insured under the policy and denying that it breached the insurance contract.  The parties conducted limited discovery, after which both parties moved for summary judgment. United requests, in the alternative to summary judgment, that

this proceeding be stayed pending resolution of the underlying *Chubb* and *Cranmore* lawsuits.

## II. LEGAL STANDARDS

### A. *Standard of Review*

Summary judgment is appropriate when, based on the pleadings, discovery, and disclosure materials in the record, "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).  A "genuine" dispute is one that, based on the supporting evidence, "a reasonable jury could resolve . . . in favor of the non-moving party," and a "material" fact is one that has "the potential to affect the outcome of the suit under the applicable law."  *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996) (citations and quotation marks omitted).

Where, as here, both parties have moved for summary judgment, I "rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Bienkowski* v. *Northeastern Univ.*, 285 F.3d 138, 140 (1st Cir. 2002) (citation omitted); *see Mandel* v. *Bos. Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006).  Summary judgment is appropriate if "either of the parties deserves judgment as a matter of law

on facts that are not disputed." *Adria Int'l Grp., Inc.* v.
*Ferré Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001).

**B.   *The Duty to Defend***

A liability insurer has a duty to defend a third-party
complaint against an insured when "the allegations of the
complaint are 'reasonably susceptible' of an interpretation that
they state or adumbrate a claim covered by the policy terms."[8]
*Sterilite Corp.* v. *Continental Cas. Co.*, 458 N.E.2d 338, 341
(Mass. App. Ct. 1983); *see also Doe* v. *Liberty Mut. Ins. Co.*,
667 N.E. 2d 1149, 1151 (Mass. 1996).   The process of determining
whether a defense is required involves "envisaging what kinds of
losses may be proved as lying within the range of the
allegations of the complaint, and then seeing whether any such
loss fits the expectation of protective insurance reasonably
generated by the terms of the policy."   *Sterilite*, 458 N.E.2d at
341; *see also Doe*, 667 N.E.2d at 1152.

This matching process does not require exacting precision.
The merits of the underlying claims or the specific legal
theories on which they are advanced are not determinative of

---

[8] The duty to defend is broader than and indeed precedes the duty
to indemnify, which arises only "when a judgment within the
policy coverage is rendered against that insured."   *See Bos.
Symphony Orchestra, Inc.* v. *Commercial Union Ins. Co.*, 545
N.E.2d 1156, 1158 (Mass. 1989).

whether a duty arises.  *See Bos. Symphony Orchestra, Inc.* v. *Commercial Union Ins. Co.*, 545 N.E.2d 1156, 1159 (Mass. 1989). "[T]he underlying complaint need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage.  There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage." *Sterilite*, 458 N.E.2d at 341 (quoting *Union Mut. Fire Ins. Co.* v. *Inhabitants of Topsham*, 441 A.2d 1012, 1015 (Me. 1982)).  Because the duty to defend arises before the resolution of a case on the merits, the duty is not determined based on the facts as they are proven at trial.  *See Bos. Symphony*, 545 N.E.2d at 1158.

When an insurer has a duty to defend any of the underlying counts in the complaint, it must defend the entire lawsuit. *Liberty Mut. Ins. Co.* v. *Metro. Life Ins. Co.*, 260 F.3d 54, 63 (1st Cir. 2001).[9]  But when all of the allegations "lie expressly outside the policy coverage and its purpose," the insurer has no duty to defend.  *Timpson* v. *Transamerica Ins. Co.*, 669 N.E.2d

---

[9] "[I]f the insurer fails to defend the lawsuit, it is liable for all defense costs and (assuming policy coverage) the entire resulting judgment or settlement, unless liability can be allocated among covered and uncovered claims." *Liberty Mut. Ins. Co.* v. *Metro. Life Ins. Co.*, 260 F.3d 54, 63 (1st Cir. 2001).

1092, 1095 (Mass. App. Ct. 1996) (quoting *Terrio* v. *McDonough*, 450 N.E.2d 190, 194 (Mass. App. Ct. 1983)).  CWC, as the party seeking coverage, bears the burden of proving that it is eligible under the terms of the insurance policy.  *Gordon* v. *Safety Ins. Co.*, 632 N.E.2d 1187, 1189 (Mass. 1994).  Where relevant facts are not in dispute, the interpretation of an insurance policy and the application of the policy to the undisputed facts is a question of law appropriate for summary judgment.  *Liberty Mut.*, 260 F.3d at 61.

## C.  *Construction of an Insurance Policy*

An insurance policy is construed under Massachusetts law using the general rules of contract interpretation.  *See Certain Interested Underwriters at Lloyd's, London* v. *Stolberg*, 680 F.3d 61, 64-65 (1st Cir. 2012); *Brazas Sporting Arms, Inc.* v. *Am. Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 4 (1st Cir. 2000). Like any other contract, the language of an insurance policy must be construed in its "usual and ordinary sense."  *Hakim* v. *Mass. Insurers' Insolvency Fund*, 675 N.E.2d 1161, 1164 (Mass. 1997).  Every word "must be presumed to have been employed with a purpose and must be given meaning and effect wherever practicable."  *Allmerica Fin. Corp.* v. *Certain Underwriters at Lloyd's, London*, 871 N.E.2d 418, 425 (Mass. 2007).

The words of the policy must be "construed in the sense that the insured will reasonably understand to be the scope of [its] coverage." *Finn* v. *Nat'l Union Fire Ins. Co. of Pittsburgh*, 896 N.E.2d 1272, 1277 (Mass. 2008) (citation omitted); *see Scottsdale Ins. Co.* v. *Torres*, 561 F.3d 74, 77 (1st Cir. 2009). Ambiguities must be interpreted against the insurer and in favor of the insured. *Allmerica*, 871 N.E.2d at 425. However, a policy provision "is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." *Citation Ins. Co.* v. *Gomez*, 688 N.E.2d 951, 953 (Mass. 1998). An ambiguity does not exist "solely because the parties disagree as to the provision's meaning." *Brazas Sporting*, 220 F.3d at 4.

## III. DISCUSSION

### A. *Applicability of the Residential Construction Work Exclusion*

United contends that it is entitled to summary judgment because the residential construction work exclusion in the United policy precludes coverage for all claims arising out of work on the Project, which was indisputably a residential construction project. CWC asks first that United be estopped from making this argument because it has undertaken a defense of Walsh on the same claims, and further argues that this exclusion

16

is not applicable to the coverage under which it is eligible.

1.   Background

The United policy held by Walsh contains an endorsement for the exclusion of "all residential construction work" from coverage under the "commercial general liability coverage part" and the "product/completed operations liability coverage part." The exclusion states:

> [T]his insurance does not apply to . . . "property damage" . . . which, in whole or in part, directly or indirectly, arises out of or is related to any past, present, continuing or future "residential construction work" performed by or on behalf of an "insured," or by or on behalf of any other person or entity, on "residential property."

The exclusion specifically provides that United has "no duty to investigate, adjust or defend . . . with respect to, a claim or 'suit' seeking damages for such injury or damage."

The exclusion defines "residential construction work" broadly as:

> [A]ll work or operations in any way related to "residential property," including but not limited to the development, design or building of a new structure or the addition to or extension of an existing structure, the maintenance, repair, renovation, restoration, improvement, betterment, alteration or modification of an existing structure, and the demolition or removal, in whole or in part, of an existing structure.[10]

---

[10] This includes "work or operations regarding the real property on which the new or existing structure is located; . . . [and] materials, parts or equipment furnished in connection with the

"Residential property" is defined as "structures intended for use or used, in whole or in part, as human dwellings, including but not limited to multi-family housing, apartments, condominiums, town home, townhouses . . . and 'mixed use structures.'"

2. Analysis

a. *Estoppel and Waiver*

CWC suggests that United should not be permitted to raise the residential exclusion as a basis for denying a defense to CWC, because United has undertaken the defense of Walsh in the same lawsuits on the same claims and under the same policy.  To succeed on this argument, CWC must demonstrate either estoppel or waiver.  *See Merrimack Mut. Fire Ins. Co.* v. *Nonaka*, 606 N.E.2d 904, 906 (Mass. 1993).  Estoppel does not apply here because CWC has presented no evidence that it "rel[ied] to [its] detriment on anything [United] did or did not do." *Id.*  To the contrary, United made clear to CWC from the beginning that it would not provide a defense to CWC.

CWC has also failed to establish that United waived its right to disclaim coverage.  Indeed, the concept of waiver of a right to disclaim coverage where the policy does not cover the

---

work or operations."

underlying claims has generally been rejected in the insurance
context, such that an insurance company may not waive the limits
of the coverage stated in its policy.  *See Merrimack Mut.*, 606
N.E.2d at 906-07.  An insurer may provisionally agree to furnish
a defense and reserve the right to disclaim coverage if it is
later determined that the policy does not apply, and may pursue
a declaratory judgment action to determine whether it was
required to defend against the claim.  *See Certain Interested
Underwriters*, 680 F.3d at 64-65; *Merrimack Mut.*, 606 N.E.2d at
907.  In defending Walsh, United expressly reserved its rights
as to indemnity based on the residential exclusion in the
policy.  There is simply no basis in law or fact for finding
waiver here.

> b.  *Reach of the Residential Exclusion Within the
>     Policy*

CWC rests its argument for the non-applicability of the
residential exclusion on its reading of the list of parts to
which the residential exclusion endorsement applies.  CWC
contends that the exclusion applies only to the
products/completed operations (PCO) portion of the commercial
general liability (CGL) coverage.  Using this limited reach of
the exclusion as its foundation, CWC argues that the coverage it
seeks does not fall within the PCO hazard, and therefore that

the residential exclusion – because it is limited to the PCO
hazard – does not serve to relieve United from its duty to
defend.  United contends that the exclusion applies to the
entirety of the policy and fully relieves it of any duty to
defend.

In order to understand CWC's interpretation of the reach of
the residential exclusion, I begin by considering the threshold
question of how the PCO coverage relates to the CGL coverage
under the terms of this insurance policy.  "The objective is to
construe the contract as a whole, in a reasonable and practical
way, consistent with its language, background, and purpose."
*Mass. Prop. Ins. Underwriting Ass'n* v. *Wynn*, 806 N.E.2d 447, 450
(Mass. App. Ct. 2004) (internal quotation marks and citations
omitted).

Some CGL policies do not cover bodily injury or property
damage encompassed by the PCO hazard, as it is defined by the
policy.  *See, e.g., Cytosol Labs., Inc.* v. *Fed. Ins. Co.*, 536
F. Supp. 2d 80, 88-89 (D. Mass. 2008).  Other CGL policies cover
such injury or damage as encompassed by the PCO hazard, but
subject such coverage to a separate policy limit.  *See* 17
Williston on Contracts § 49:114 (4th ed. Nov. 2014).  The United
policy falls in the latter category.

The common policy declarations of the United policy at issue indicate that this particular policy contains only a CGL coverage part, and does not provide coverage for other such parts presumably available from this insurer, such as commercial property coverage and liquor liability coverage.  The CGL declarations, which immediately follow the common policy declarations, state the coverage limits for this policy and enumerate an "each occurrence" limit of $1,000,000, with a "damage to premises rented to you limit" of $100,000 and an exclusion for medical expenses; a personal and advertising injury limit of $1,000,000; and a PCO aggregate limit of $1,000,000.

The provisions of the CGL coverage form that follow demonstrate, consistent with the enumeration of the coverage limits, that the policy provides limited PCO coverage as a subset of the CGL coverage subject to its own coverage limit. Section I of the coverage form describes three coverage categories: coverage A, for bodily injury and property damage liability; coverage B, for personal and advertising injury liability; and coverage C, for medical payments.  Section III of the CGL coverage form explains the limits of insurance and states that "[t]he [PCO] Aggregate Limit is the most we will pay

under Coverage A for damages because of 'bodily injury' and
'property damage' included in the '[PCO] hazard.'"[11]  Although
Coverage A does not explicitly state that it includes coverage
for injury or damage encompassed by the PCO hazard, it does not
exclude such coverage either.  Among the exclusions within
Coverage A is an exclusion for damage to "property that must be
restored, repaired or replaced because 'your work' was
incorrectly performed on it."  This exclusion expressly
indicates that it "does not apply to 'property damage' included
in the '[PCO] hazard.'"[12]  Finally, section V provides a
definition of PCO hazard.[13]  When read together, all of these

---

[11] Section III also states that the general aggregate limit
excludes "damages because of 'bodily injury' or 'property
damage' included in the '[PCO] hazard.'"
[12] The exclusion for damage to your work prohibits coverage for
"'property damage' to 'your work' arising out of it or any part
of it and included in the 'products-completed operations
hazard.'"  This similarly suggests that if the damage is covered
by the PCO hazard, it is not eligible for additional coverage
under the CGL coverage.
[13] Section V defines the PCO hazard as including "all . . .
'property damage' occurring away from premises you own or rent
and arising out of 'your product' or 'your work.'"  Excluded
from the PCO hazard is "[w]ork that has not yet been completed
or abandoned."  Work is considered completed "[w]hen all of the
work called for in your contract has been completed," or "[w]hen
that part of the work done at a job site has been put to its
intended use by any person or organization other than another
contractor or subcontractor working on the same project,"
whichever is earlier.  "Work that may need service, maintenance,
correction, repair or replacement, but which is otherwise
complete, will be treated as completed."

components of the United policy demonstrate that PCO hazard coverage is provided under Coverage A of the CGL coverage part, but is subject to its own limit (as articulated in the CGL declarations) separate and apart from the limits imposed on the other coverages.  *Compare North Counties Eng'g, Inc.* v. *State Farm Gen. Ins. Co.*, 169 Cal. Rptr. 3d 726, 744 (Cal. Ct. App. 2014) (concluding that liability policy included PCO coverage because it listed PCO in column in policy declarations titled "Coverages and Limits" with a limit of $2 million, and it included a definition of "PCO hazard"), *with Liberty Mut. Ins. Co.* v. *Metro. Life Ins. Co.*, 53 F. Supp. 2d 529, 533-34 (D. Mass. 1999) (concluding that it could not be determined as a matter of law whether insurance policy included personal injury coverage where such coverage was suggested through references in endorsements but was not listed as including a premium for such coverage).

Although CWC correctly characterizes the PCO coverage as a subset of the CGL coverage part, its reading of the residential exclusion endorsement as applying only to the PCO hazard within the CGL coverage part is mistaken and inconsistent with the overall import of the endorsements and documents included in the United policy.  The endorsements in the United policy are

23

"separately paginated amendments" that "overr[i]de the underlying provisions of the part of the policy they purport to modify.  *See Insituform Techs., Inc.* v. *Am. Home Assur. Co.*, 566 F.3d 274, 276 (1st Cir. 2009); *see also Nat'l Union Fire Ins. Co. of Pittsburgh* v. *Lumbermens Mut. Cas. Co.*, 385 F.3d 47, 55 (1st Cir. 2004) ("where the provisions in the body of the policy and those in the endorsement . . . are in irreconcilable conflict[,] the provisions contained in the endorsement . . . will prevail over those contained in the body of the policy" (quoting *Farmers Ins. Exch.* v. *Ledesma*, 214 F.2d 495, 498 (10th Cir. 1954)).

Every endorsement attached to the United policy includes a list of parts which it modifies.  The endorsement first lists the name of the endorsement and then states: "This endorsement modifies insurance provided under the following," followed by a colon and a list of parts, with each modified part occupying its own line.  The vast majority of the endorsements, including the additional insured endorsement, indicate that they modify only the CGL coverage part.  Several endorsements, including the residential exclusion endorsement and the endorsements for the interim premium audit condition, the independent contractors limitation endorsement, the cross liability exclusion, the

continuous & progressive exclusion, and the non-duplication of limits of insurance endorsement, list both the CGL coverage part and the PCO liability coverage part.[14]  Other endorsements list several parts.  For example, the calculation of premium endorsement contains a list of fifteen discrete parts which includes the CGL coverage part and the PCO liability coverage part, among others.[15]

CWC contends that because the policy contains only a CGL coverage part – into which the PCO hazard is subsumed – the endorsements that list the CGL coverage part and the PCO liability coverage part together should be read as applying only to the PCO hazard and not to the remainder of the CGL coverage part.  In making this argument, CWC suggests that the enumerated items in the list of parts modified by an endorsement should be considered effectively to modify each other.  Although at first

---

[14] The residential exclusion reads:
> **Exclusion – All Residential Construction Work**
> THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:
> **Commercial General Liability Coverage Part**
> **Product/Completed Operations Liability Coverage Part**

[15] Other endorsements that list the CGL coverage part, the PCO coverage part, and other parts are the nuclear energy liability exclusion endorsement, the exclusion of certified acts of terrorism and other acts of terrorism, and the general service of suit endorsement.

blush this interpretation might have seemed plausible, when its logic is extended to endorsements that list more than just the CGL and PCO coverage parts, it becomes clear that the interpretation is unreasonable.

If the list of parts establishes or acknowledges some subordinate relationship between the enumerated parts, the reach of an endorsement such as the calculation of premium endorsement, which lists fifteen parts, or the nuclear energy liability exclusion endorsement, which lists ten parts, would be reduced to the narrowest reference made in the list, after much deciphering of the potential relationships among the various enumerated parts.[16]  Surely an "objectively reasonable insured, reading the relevant policy language," would not expect to have to engage in such elaborate assessments of the relationships between various listed parts in order to determine the reach of the modification set forth in the endorsement.  *See Trustees of Tufts Univ.* v. *Comm. Union Ins. Co.*, 616 N.E.2d 68, 72 (Mass.

---

[16] This would be an illogical result because some of the endorsements modifying multiple parts and bearing names connoting broad implications, such as those pertaining to nuclear energy and acts of terrorism.  It would also reduce all six endorsements listing the CGO and PCO coverage parts to a modification of only the PCO hazard.

1993) (quoting *Hazen Paper Co.* v. *U.S. Fid. & Guar. Co.*, 555
N.E.2d 576, 583 (Mass. 1990)).[17]

The only reasonable interpretation of the list of parts
atop each endorsement is that the endorsement applies
independently to each listed part, which may or may not be
included in the particular policy at hand.   These endorsements
are drawn from generic forms, as indicated by their reference to
the copyright held by the Insurance Services Office at the
bottom of each page, and are used for a variety of different
insurance policies.   The forms clearly contemplate the potential
inclusion of other coverage parts – including liquor liability
coverage, commercial property coverage, and separate PCO

---

[17] CWC's reading is also at odds with basic principles of policy
interpretation.   Every phrase employed in an insurance policy is
presumed to serve a purpose.   *Allmerica Fin. Corp.* v. *Certain
Underwriters at Lloyd's, London*, 871 N.E.2d 418, 425 (Mass.
2007); *see Charles I. Hosmer, Inc.* v. *Commonwealth*, 19 N.E.2d
800, 804 (Mass. 1939).   Under CWC's interpretation of the
meaning of a reference to the PCO liability coverage part in an
endorsement – that only the PCO hazard portion of the CGL
coverage is modified – there would be no purpose in also listing
the CGL coverage part itself.   Of course, the same criticism
could be made of United's position that any parts listed in an
endorsement that are not included in the policy at issue are to
be ignored.   However, United's position in this regard is the
only reasonable one when the endorsements are understood in the
broader context of standard insurance forms attached to modify
the coverage that is provided in the specific parts included in
the underlying policy.   This position does not require the same
mental gymnastics that CWC's interpretation does in determining
which parts fit within the others.

liability coverage – that are not included in this particular policy. A reasonable insured would understand that if a listed part is not included in the policy, then the endorsement logically cannot apply to it. On the other hand, if a listed part is included in the policy, then the endorsement modifies it. Although this renders references to all parts but the CGL coverage part in this particular policy irrelevant — because the policy contains only a CGL part and no others — phrases and clauses "must be given meaning and effect" only when it is practicable to do so, and only as "construed with all the other phraseology contained in the instrument, which must be considered as a workable and harmonious means for carrying out and effectuating the intent of the parties." *Charles I. Hosmer, Inc.* v. *Commonwealth*, 19 N.E.2d 800, 804 (Mass. 1939).

This reading undoubtedly renders the residential exclusion far broader than CWC would like. But even though an exclusionary clause is to be construed narrowly, "[w]e are not free to revise it or change the order of the words." *Finn*, 896 N.E.2d at 1277 (citation omitted). As a California court observed in interpreting a similar residential exclusion, "[a]n insurer may select the risks it will insure and those it will not, and a clear exclusion will be respected." *Calif.*

28

*Traditions, Inc.* v. *Claremont Liab. Ins. Co.*, 127 Cal. Rptr. 3d 451, 457 (Cal. App. Ct. 2011) (internal quotation marks and citations omitted).  Although an insured's reasonable expectation of coverage is an important consideration, it comes into play only when a policy provision is ambiguous.  *Clark Sch. for Creative Learning, Inc.* v. *Phila. Indem. Ins. Co.*, 734 F.3d 51, 57 (1st Cir. 2013); *see Finn*, 896 N.E.2d at 1278-79. "[W]hen a contract is not ambiguous, a party can have no reasonable expectation of coverage when that expectation would run counter to the unambiguous language of an insurance policy." *Clark*, 734 F.3d at 57.

I conclude that the reach of the residential exclusion is not ambiguous.  In the context of the policy documents overall, it is susceptible to only one reasonable interpretation: that it applies to the entirety of the CGL coverage part, and would apply to a separate PCO coverage part if one were included in this policy.  Because the CGL coverage part represents the entirety of the coverage provided under the United policy, the residential exclusion applies to the entirety of the available coverage.

   c.  *Applicability of the Residential Exclusion*

CWC does not dispute that the *Chubb* and *Cranmore* lawsuits

arise out of work performed by Walsh and CWC for a residential renovation at the Project.  The *Chubb* complaint states that CWC "was renovating an existing apartment building complex adjacent to" the ART property, that it "demolished several buildings as part of the [Project]" and used fire hoses connected to public fire hydrants for dust control during demolition, and that it was water from these fire hoses that caused the flood damage to the adjacent property.  Similarly, the *Cranmore* complaint alleges that the ART property incurred damage "in connection with releases of water and infiltration of water to its property . . . as a result of demolition, blasting and construction activities by the Defendants" in furtherance of their work on the Project, "which included substantial site modification, razing existing apartment buildings and replacing them with a 266-unit mix of apartment and townhouse condominiums" on behalf of the owner of the property, the Boston Housing Authority.

There is no question that the Project falls squarely within the terms of the residential exclusion.  The property previously had been used and would continue to be used as "residential property," as defined by the exclusion, and the work CWC, Walsh, and the other subcontractors performed there was "related to" this property.  Accordingly, because I conclude that the

residential exclusion applies to all available coverage under the United policy, CWC is not entitled to coverage for claims arising out of the work performed at the Project, and I will grant summary judgment in favor of United.

**B.     *Whether the Allegations in the Underlying Lawsuits State a Claim Covered by the Additional Insured Endorsement***

Although this case is resolved on the basis of the residential exclusion, I address briefly the contention by CWC that it should be granted summary judgment because the property damage alleged in the *Chubb* and *Cranmore* lawsuits and the acts and omissions allegedly giving rise to it satisfy the conditions for coverage of CWC as an additional insured under the United policy.  United does not contest that CWC was eligible for coverage as an additional insured, but instead contends that there are genuine factual issues that make summary judgment as to the coverage and its corresponding duty to defend inappropriate.  I agree with United that, were this case to be decided based on the availability to CWC of additional insured coverage, there would be issues of material fact that would preclude summary judgment.

The additional insured endorsement to the United policy limits the coverage available to additional insureds "to liability arising out of [the primary insured's] ongoing

31

operations performed for that insured." The endorsement
excludes coverage for property damage that occurs after "[a]ll
work, including materials, parts or equipment furnished in
connection with such work, on the project (other than service,
maintenance or repairs) to be performed by or on behalf of the
additional insured(s) at the site of the covered operations has
been completed."[18]

To invoke a duty to defend, then, the allegations in the
*Chubb* and *Cranmore* complaints must be "'reasonably susceptible'
of an interpretation that they state or adumbrate a claim" of
liability arising out of Walsh's ongoing operations at the
Project. *See Sterilite*, 458 N.E.2d at 341; *see also Bos.
Symphony*, 545 N.E.2d at 1158. The thrust of the *Chubb* and
*Cranmore* complaints is that negligent acts or omissions by CWC
and/or its subcontractors were the direct and proximate cause of
water flooding into the ART property from fire hoses that were

---

[18] The endorsement also excludes coverage for property damage that
occurs after "[t]hat portion of 'your work' out of which the
injury or damage arises has been put to its intended use by any
person or organization other than another contractor or
subcontractor engaged in performing operations for a principal
as a part of the same project." It can be reasonably inferred
from the record that the property had not been put to use by
anyone other than CWC and other subcontractors on June 3, 2008,
when the demolition work was apparently still ongoing.
Accordingly, this exclusion would not serve to relieve United
from a potential duty to defend CWC.

left on after use for dust control on the Project site on June 2, 2008.

As a factual matter, it is unclear on the record before me precisely what involvement Walsh had in the use of the fire hoses and hydrants at the Project site.  Although there is no dispute that Walsh was involved with the water access, there is a dispute whether the need for hoses to access off-site hydrant water was connected to Walsh's performance of its contractual obligations.[19]  This is a factual dispute material to whether the

---

[19] Under the subcontract, Walsh was to cut and cap utility services, remove and dispose of certain soils, and perform the necessary dust control and street sweeping relevant to these actions.  Other documents submitted by CWC indicate that Walsh had some involvement in ensuring continued water access for the demolition contractor, with whom Walsh worked in tandem, particularly after Walsh's performance of a global cut and cap. By the report of Walsh's deponent, Patrick Walsh, Walsh assisted in connecting hoses to feed water from nearby fire hydrants to enable the demolition and other contractors to perform their work, and Walsh also assessed the flow of water to the hydrants.
Despite the subcontract's reference to dust control and the complaints' assertions that the hoses were used in performing dust control, United characterizes Walsh's involvement with the hoses and hydrants as unrelated to its performance of its duties under its subcontract with CWC.  CWC contends that but for Walsh's improper performance of its contractual duties in performing a global cut and cap rather than sequential ones, there would have been no need to employ hoses connected to public fire hydrants to complete the demolition work, since the on-site hydrants would not have been deprived of water.  For its part, Walsh contends that the global cut and cap made no difference in terms of water access at the Project site, because an earlier pilfering had cut water access regardless.

alleged damages arise out of Walsh's ongoing operations performed for CWC. *See Sanchez*, 101 F.3d at 227.

There is also an issue of material fact whether Walsh's operations were completed, thereby ending CWC's coverage as an additional insured under the United policy.[20]  The parties agree that Walsh completed the global cut and cap on or about May 23, 2008, which is potentially indicative of the completion of Walsh's work — although not dispositive of the issue — where the subcontract called for numerous other ancillary responsibilities, including removing and disposing of certain soils, and performing necessary dust control and street sweeping.  The parties also agree that Walsh returned to the Project site on June 2, 2008, the day prior to the property damage, and performed work relating to water access, but they dispute the purposes of this return.[21]  Accordingly, there is a

---

[20] Although "completed" is not defined in the additional insured endorsement, the term is defined elsewhere in the policy (for the purpose of the products-completed operations hazard) as "[w]hen all the work called for in your contract has been completed."  *See* Webster's Third New Int'l Dictionary 465 (1986) (defining "complete" as "possessing all necessary parts" and "fully realized").

[21] CWC contends that Walsh's work on June 2 was part of its ongoing effort to correct flaws with its earlier work.  This contention, however, fails to establish that the performance of the contract was incomplete, where the language of the exclusion explicitly indicates that "service, maintenance or repairs" do not render work incomplete.  United maintains that this work was

34

triable issue whether the work required by the contract was completed by the date of the damage to the ART property.  Were the case to turn on whether CWC was eligible for additional insured coverage at the time of the damages alleged in the underlying lawsuits, genuine issues of material fact would thus preclude the grant of summary judgment in favor of either party.

## IV. CONCLUSION

For the reasons set forth above, I DENY the plaintiff's motion for summary judgment, Dkt. No. 24, and GRANT the defendants' motion for summary judgment, Dkt. No. 33.


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

entirely unrelated to the underlying subcontract, but offers no additional evidence to demonstrate that Walsh had fully performed all of its contractual duties prior to June 3, 2008.